THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:22-CR-113 |
| | : | (JUDGE MARIANI) |
| TERENCE WILKENSON, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Terence "Jab" Wilkenson[1] was arrested on September 20, 2021, and

charged with possession with intent to distribute cocaine on March 22, 2022. (Doc. 1.)

Presently before the Court is Defendant's "Motion to Dismiss Indictment and Suppress

Evidence." (Doc. 32.) Defendant's Motion seeks to suppress the physical evidence

gathered from his vehicle on the day of his arrest, and to dismiss the indictment. (*See id.*)

Defendant filed his Motion on September 19, 2022. (*Id.*) Following several

extensions, the Government filed its brief in opposition on January 17, 2023. (Doc. 43.)

This Court held an evidentiary hearing (the "Hearing") on June 7, 2023. Thereafter, the

parties filed post-hearing briefs. (Docs. 53, 54.) Defendant's Motion is now ripe for

disposition, and for the reasons that follow, it will be denied.

_____

[1] The Court notes that the record reflects different spellings of Defendant's first and last names. Except when quoting directly, the Court refers to Defendant as "Terence Wilkenson" throughout for the sake of simplicity.

## II. Factual Background[2]

On September 20, 2021, Pennsylvania State Police ("PSP") Trooper Joshua Powell

was in a marked patrol vehicle positioned at mile marker 298 on Interstate 80, in Pocono

Township, Monroe County, Pennsylvania. (Hearing Tr. at 6:16–17, 17:4–5.)  He was

observing westbound traffic.  (*Id.*)  At approximately 3:45 p.m., he noticed a "dark grey

Dodge Durango . . . following too closely behind a tractor-trailer." (*Id.* at 8:18–24.)  He also

noticed the driver was wearing a white ear bud in his left ear.  (*Id.*)

Trooper Powell then pulled onto the highway to initiate a stop of the Durango.  (MVR

at 0:36.)  As he approached the Durango, he noticed it had an Ohio license plate.  (*Id.* at

2:11.)  He also observed that the back windows of the Durango had a "double tint."

(Hearing Tr. at 40:1–13.)

Once the Durango had stopped, Trooper Powell approached its passenger side to

speak to the driver.  (*Id.* at 12:19–22.)  He testified that he noticed an "overwhelming smell

of air fresheners" coming from the Durango, though he did not see any.  (*Id.* at 13:4–7.)  He

also observed a single key on the dashboard.  (*Id.*)  He explained to the driver why he had

been stopped—for following too closely and wearing an ear bud—and asked for the driver's

license, registration, and insurance.  (*Id.* at 13:14–21; MVR at 4:30–50.)  He told the driver,

---

[2] The Court bases the factual background on the "Mobile Video Recorder" (commonly referred to as "MVR" or "dash-cam") footage of the events of September 20, 2021 (Gov't Ex. A, hereinafter "MVR"), the parties' briefs, and the hearing testimony.

"If your license is good, I'll just get you going with a warning." (MVR at 5:13.) The driver

provided his license, which identified him as Defendant, Terence Jab Wilkenson. (Hearing

Tr. at 13:12–17.) Defendant also provided his registration, which indicated the Durango

was registered to him, and began searching for his insurance information on his phone. (*Id.*

at 13:18–14:1.)

Trooper Powell asked Defendant where he was going, and Defendant said he was

going to Toledo. (MVR at 6:17.) Defendant then volunteered that he "had to pick up a

transfer case for this vehicle." (*Id.* at 6:22.) Trooper Powell asked whether he "[did] that as

a hobby" or for business. (*Id.* at 6:30.) Defendant explained that the transfer case was for

him, specifically "for this vehicle," although he did work for a used car dealership. (*Id.* at

6:22, 6:35.) Throughout this conversation, Defendant continued to look for his insurance

information on his phone. (*Id.*)

Trooper Powell told Defendant he would go back to his patrol car to look at the

license and give Defendant some time to find his insurance. (*Id.* at 6:45.) Trooper Powell

testified that when he walked back to his patrol car, he observed a transfer case in the

backseat of the Durango. (Hearing Tr. at 15:23–16:1.)[3] He testified that, even though the

presence of the transfer case was consistent with Defendant's stated reason for travel, he

"thought it was very strange" that someone would drive "a vehicle, particularly, a vehicle

---

[3] Trooper Powell indicated at the Hearing that he was familiar with transfer cases, and described a
transfer case as "a piece of the vehicle's drive train, which distributes power from the front and back tires
for four-wheel drive and all-wheel drive vehicles." (Hearing Tr. at 15:18–20.)

missing its drive train, . . . 15 plus hours, a thousand plus miles across multiple metropolitan areas to get a piece for that vehicle." (*Id.* at 16:9–13.)

Back in his patrol car, Trooper Powell ran Defendant's license and then ran his name through the National Crime Information Center ("NCIC") database to check his criminal history. (*Id.* at 17:5–10.) The results of the NCIC check showed "multiple arrests and convictions in multiple different states" for drug trafficking and possession of firearms. (*Id.* at 18:20–19:2.) The most recent conviction was in 2017. (MVR at 11:52.)[4]

After spending about eight minutes running these checks in his patrol car, Trooper Powell reapproached the Durango. (*Id.* at 15:00; Hearing Tr. at 19:16–20.) Defendant had located an insurance card, but it was expired. (Hearing Tr. at 19:16–20.) Trooper Powell told Defendant he was not concerned about the insurance, because if it were actually expired, Defendant's registration would be invalid. (MVR at 15:30–16:24.) He said he was more concerned about the traffic violations. (*Id.*) He then asked Defendant to exit the vehicle and return to the patrol car so that he could issue a warning. (*Id.*) Trooper Powell testified that at this point, he intended to investigate further because he had developed "reasonable suspicion, in [his] training and experience, that [Defendant] was involved in criminal activity." (Hearing Tr. at 20:18–25.) He testified further:

> **Q.** Based upon your training and experience, what were the indicators, at that point, when you made that decision to ask him out of the car? What were you basing that upon?

---

[4] At some points in the MVR, Trooper Powell is heard narrating what he is doing and describing what he is seeing. (*See, e.g.,* MVR at 11:52.)

*A.* At that point, I had a vehicle that's driving on a known drug corridor—

*Q.* That would be I-80?

*A.* Interstate 80 is a main drug corridor, because it's a main artery running from New York to California and is often the quickest way from point A to point B for a drug trafficker to transport illicit substances, cash, firearms, whatever he has, from point A to point B.

I'm also smelling an overwhelming smell of air fresheners or a masking agent, because I didn't—I can't see anything inside the vehicle, I can't see air fresheners hanging anywhere, so that leads me to believe he's either spraying something inside the vehicle or has air fresheners strategically placed inside the vehicle to mask any odors inside the vehicle.

And I'm, also, seeing a single key, which wasn't in the ignition, it was on the dashboard. This is a factor in criminal activity, when you have a single key, without any house keys or key chains or anything, because that vehicle is, essentially, a work vehicle that he uses to transport illicit substances or other contraband from one point to another.

And I'm, also, seeing double window tint in the back, which is common, especially, for hatchback vehicles. It goes hand in hand with both drug trafficking and hidden compartments inside vehicles, because these type of vehicles are commonly equipped with traps or hidden compartments in the back end of the vehicle towards the rear.

And I'm, also, seeing a lengthy criminal history to include drug trafficking of both cocaine, heroin, also, gun charges, as well as the information that he gave to me, voluntarily, for the reason of his trip. In my training and experience, it didn't make any sense as to why he was traveling so far from Toledo to get this piece for his vehicle.

(*Id.* at 21:1–22:11.)   Accordingly, Trooper Powell's intention in bringing Defendant back to

the patrol car was both to "complete the business of the traffic stop and give him a warning"

but also to "question him further" regarding this suspicion.  (*Id.* at 25:10–12.)

Defendant then stood at the passenger side of the patrol car and Trooper Powell

questioned him while he prepared a written warning.  (MVR at 17:00.)  Trooper Powell

asked Defendant where he picked up the transfer case. (*Id.* at 18:00.) Defendant said that he purchased it from a company called LKQ Wreckers in the Bronx. (*Id.* at 18:05.) He explained, "Every place I found it was $2,100. This one was $770." (*Id.* at 18:11.)

At the hearing, Trooper Powell testified that this information raised his suspicion further. First, he considered New York a "main source city for narcotics." (Hearing Tr. at 26:22–25.) And second, he was familiar with LKQ Wreckers, and "[knew] people that [had] ordered parts from that same company and had it shipped to a closer destination in their city or town." (*Id.* at 26:2–5.)

Trooper Powell then asked more about the Durango, and the two discussed Defendant's purchase of the vehicle. (MVR at 18:29–45.) Next, Trooper Powell asked about the length of Defendant's trip, and Defendant explained that he had stayed for the weekend to visit family in Westchester. (*Id.* at 18:50–19:16.) Throughout this conversation, Defendant continues to search for his insurance on his phone. Trooper Powell tells him again, "You're good man, it's no big deal," but Defendant continues his efforts, saying, "I gotta get it anyway." (*Id.* at 22:18.)

After a few minutes of this discussion, Trooper Powell asked, "When's the last time you got in trouble with the police?" (*Id.* at 24:12.) Defendant responded honestly. (Hearing Tr. at 29:24–25.) Trooper Powell asked if he had "anything in the car that [he was] not supposed to have," and then asked about specific illegal substances, and Defendant repeatedly said no. (MVR at 24:55–25:25.)

6

Trooper Powell asked if Defendant would consent to a search of his vehicle. (*Id.* at 25:25–32.) Defendant did not consent. (*Id.*) Trooper Powell then exited his vehicle to provide the warnings and return Defendant's documents to him. (*Id.* at 25:47–26:10.) Trooper Powell informed Defendant that he was going to call for a PSP canine unit. (*Id.* at 26:10–21.) He proceeded to make several phone calls to a canine officer and canine supervisor. (Hearing Tr. at 32:24–34:22.)

Corporal Anthony Doblovasky, a canine officer, ultimately answered the call but did not arrive on the scene until approximately eighty-two minutes later. (MVR at 1:48.) At the time of his arrival, Defendant had been detained for approximately 104 minutes. Corporal Doblovasky's canine did an exterior sniff of the Durango, and the canine gave a "positive alert indication to the vehicle." (Hearing Tr. at 28:7–11.) A search warrant was obtained, and a subsequent "search of the vehicle revealed a hidden compartment in the back passenger side panel of the vehicle" that contained 3.9 kilograms of cocaine hydrochloride. (*Id.* at 28:13–16; Doc. 53 at 12.)

On March 22, 2022, Defendant was indicted by a federal grand jury and charged with one count of possession with intent to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. § 841(a) and (b)(1)(B). (Doc. 1.)

7

## III. LEGAL STANDARD & ANALYSIS

Defendant argues the evidence gathered from the Durango should be suppressed because the traffic stop was unlawfully extended in violation of the Fourth Amendment. (*See* Doc. 33 at 1.)[5]  The Government contends that any expansion of the stop beyond its initial traffic-enforcement mission was supported by reasonable suspicion and was therefore lawful.  (*See* Doc. 43 at 17.)  Because Trooper Powell had reasonable suspicion of criminal activity before he measurably extended the stop, no Fourth Amendment violation occurred.

### A. Fourth Amendment

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures."  U.S. Const. amend. IV.  "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008).  "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  Here, because the seizure at issue occurred without a warrant, the Government bears the burden of demonstrating reasonableness.  *See United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (first citing *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); then citing

---

[5] Defendant's arguments regarding the validity of the initial stop are made in passing and, in any event, are without merit.

8

*United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002); and then citing *Johnson*, 63

F.3d at 245) ("The Government bears the burden of showing (and presenting evidence) that

the traffic stop was reasonable.").

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be

effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d

164, 167 (3d Cir. 2002).  "A well-established exception to the Fourth Amendment's warrant

requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a

reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672

F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  "While

'reasonable suspicion' is a less demanding standard than probable cause and requires a

showing considerably less than preponderance of the evidence, the Fourth Amendment

requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528

U.S. at 123.  Moreover, to lawfully conduct an investigatory or "*Terry* stop," an officer must

be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of

criminal activity." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27, 28 (1968)).

As explained by the Supreme Court in *Kansas v. Glover*, reasonable suspicion

> "can be established with information that is different in quantity or content than
> that required to establish probable cause." *Alabama v. White*, 496 U.S. 325,
> 330, 110 S. Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the
> factual and practical considerations of everyday life on which reasonable and
> prudent men, not legal technicians, act." [*Navarette v. California*, 572 U.S. 393,
> 402 (2014)] (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct.
> 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks
> omitted)). Courts "cannot reasonably demand scientific certainty . . . where

none exists." [*Wardlow*, 528 U.S. at 125]. Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; *see also Navarette*, *supra*, at 403, 134 S. Ct. 1683 (noting that an officer "'need not rule out the possibility of innocent conduct'").

––– U.S. –––, 140 S. Ct. 1183, 1187–88, 206 L.Ed.2d 412 (2020). Stating that Supreme

Court "precedents . . . repeatedly affirmed that the ultimate touchstone of the Fourth

Amendment is reasonableness," the Court emphasized that "[t]he standard takes into

account the totality of the circumstances—the whole picture." *Id.* at 1191 (internal

quotations and citations omitted).

By adopting a "totality of the circumstances" approach, the Supreme Court has

rejected a "divide-and-conquer analysis." *United States v. Arvizu*, 534 U.S. 266, 274

(2002). Instead, "the whole picture must be taken into account," *United States v. Cortez*,

449 U.S. 411, 417 (1981), and although any single factor may not "by itself [be] proof of any

illegal conduct," and may in fact be "quite consistent with innocent travel," considered

together, the factors may amount to reasonable suspicion. *United States v. Sokolow*, 490

U.S. 1 (1980). Finally, courts "afford significant deference to a law enforcement officer's

determination of reasonable suspicion." *United States v. Foster*, 891 F.3d 93, 104 (3d Cir.

2018).

As Defendant argues here, even if a traffic stop is initially supported by reasonable

suspicion, its extension may render it unlawful. The Third Circuit addressed specifically the

permissibility of the extension of a traffic stop in *United States v. Hurtt*, 31 F.4th 152, 159

(3d Cir. 2022). The *Hurtt* court first noted that "[e]ven if an officer lawfully stops a suspect at

first, 'it could become "unreasonable," and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time.'" 31 F.4th at 159 (quoting *Clark*, 902 F.3d at 409).  The court then looked to *Rodriguez v. United States,* where

> the [Supreme] Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." [575 U.S. 348, 350 (2015).]  Thus, "a seizure justified only by a police-observed traffic violation, . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission."  [*Id.* at 350–51.]

*Hurtt*, 31 F.4th at 159.[6]

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 355).  The *Green* court explained that, pursuant to *Rodriguez*, "we must first determine when the stop was measurably extended. . . .  After determining when the stop was extended—the '*Rodriguez* moment,' so to speak—we can assess whether the facts available to [the officer] at that time were sufficient to establish reasonable suspicion." *Id.*  After the *Rodriguez* moment,

> "nothing later in the stop can inform our reasonable suspicion analysis." [*Green*, 897 F.3d at 182.] In short, we ask whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality. Any break in that mission taints the stop because it is the result of an unreasonable delay. [*See, e.g.*, *United States*

---

[6] Citations footnoted in *Hurtt* are bracketed in this opinion.

*v. Garner*, 961 F.3d 264, 271–72 (3d Cir. 2020) (holding that there was no unlawful extension of the traffic stop because the officer "had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop"); *Yoc-Us v. Att'y Gen.*, 932 F.3d 98, 105–06 (3d Cir. 2019) (holding that the officer was justified for first stopping the van for speeding but that it was an unlawful extension to investigate the immigration status of the passengers); *Clark*, 902 F.3d at 410–11 (questioning the passenger after receiving information from dispatch impermissibly extended the stop because the traffic stop's mission "to address the traffic violation that warranted the stop" was complete).]

*Hurtt*, 31 F.4th at 159.

Importantly, when it comes to inquiries unrelated to the traffic stop, "there is no *de minimus* exception to" the *Rodriguez* rule. *Clark*, 902 F.3d at 410 (citing *Rodriguez*, 575 U.S. at 357). In describing what inquiries qualify as unrelated to a traffic stop, *Rodriguez* noted that ordinary inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The Third Circuit has further held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *Garner*, 961 F.3d at 271 (first citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); and then citing *Clark*, 902 F.3d at 410).

"In performing these on-mission tasks, '[o]fficers should be reasonably diligent,' and 'the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it.'" *Hurtt*, 31 F.4th at 160 (quoting *United States v. Yusuf,* 993 F.3d 167, 182 (3d Cir. 2021) (internal quotation omitted)). As stated in

*Garner*, "[t]o lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." 961 F.3d at 271 (first citing *Rodriguez*, 575 U.S. at 355; and then citing *Clark*, 902 F.3d at 410).  If the officer possessed reasonable suspicion of criminal activity prior to extending the traffic stop, no violation of the Fourth Amendment has occurred.  *See id*.

When reviewing the allegation that a traffic stop was improperly extended, a court is to "review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable."  *Clark*, 902 F.3d at 409 (citing *United States v. Delfin-Colina*, 464 F.3d 392, 397–98 (3d Cir. 2006)).

### B. Analysis

Here, Trooper Powell testified to six factors that contributed to his suspicion before he extended the traffic stop by asking Defendant to exit his vehicle.  These factors amounted to reasonable suspicion when considered in totality.  Accordingly, because Trooper Powell had reasonable suspicion of criminal activity before he deviated from the traffic-based mission of the stop, no Fourth Amendment violation occurred, and the evidence resulting from the stop will not be suppressed.

### 1. Rodriguez *Moment*

13

First, the Court must determine if and when the traffic stop was measurably extended. *See Green*, 897 F.3d at 179. The Government asserts that "the traffic stop was not prolonged or extended in any way until Wilkenson was brought back to Trooper [Powell's] patrol vehicle and further questioned . . . about the transfer case." (Doc. 53 at 2.) Defendant's proposed *Rodriguez* moment is virtually the same: "Trooper Powell began extending this stop almost immediately after determining that Mr. Wilkerson had a prior record." (Doc. 54 at 12.) Up until that point—when Trooper Powell directed Defendant to exit his vehicle after checking his criminal history—his focus was on the traffic violations. Prior to that moment, he made ordinary traffic-related inquiries, such as "checking the driver's license," "inspecting the automobile's registration," and requesting "proof of insurance." *Rodriguez*, 575 U.S. at 355.

To be sure, the conversation almost immediately turned to Defendant's travel plans, and consequently, the transfer case. But it was Defendant, not Trooper Powell, who initially brought up the transfer case. (*See* MVR at 6:17.) And importantly, questions regarding travel plans are within the scope of a traffic stop. *See Garner*, 961 F.3d at 271 (first citing *Givan*, 320 F.3d at 459; and then citing *Clark*, 902 F.3d at 410). Trooper Powell did not divert from the stop's traffic-based mission by subsequently inquiring further into Defendant's origin of and reason for his travel.

Moreover, when Defendant was asked to exit his vehicle, he still had not presented any valid insurance information. Until Trooper Powell later advised him that he was not

concerned about the insurance, locating the insurance information remained a basic and necessary element of the traffic stop, and it had not yet been resolved.

Trooper Powell's testimony also supports the parties' proposed *Rodriguez* moment. Indeed, he admitted that at the point he directed Defendant to the patrol car, his mission had shifted into an investigatory one. While he still had to issue a warning to complete the traffic-based mission, he testified that he also intended to investigate further because he had developed "reasonable suspicion, in [his] training and experience, that [Defendant] was involved in criminal activity." (Hearing Tr. at 20:18–25.) This investigation of unrelated criminal activity measurably extended the traffic stop.

But before concluding this was the *Rodriguez* moment, the Court must ensure there was no earlier deviation from the stop's mission. Specifically, it is worth addressing whether the criminal history check, completed prior to the parties' proposed *Rodriguez* moment, was a traffic-related inquiry.

Trooper Powell testified that before directing Defendant to the patrol car, he both ran Defendant's driver's license and searched the NCIC database for Defendant's criminal history. The former is, without question, an ordinary traffic-related inquiry. *Rodriguez*, 575 U.S. at 355. The latter is less clear. If the criminal history check was not tied to the stop's traffic-based mission, it was an approximately eight-minute diversion that measurably extended the stop.

15

On cross-examination, Trooper Powell explained why he checked Defendant's

criminal history:

> **Q.** And what relation did going through his criminal history have to the traffic
> stop?
>
> **A.** Well, I was running his information. I frequently run criminal history so I know
> who I'm talking to. Just in the same way I run his driver's license and make sure
> that's valid, I ran his criminal history to see what kind of things he has been
> involved in in the past.

(Hearing Tr. at 57:16–22.)  Though ambiguous, this testimony could be understood to

indicate that he ran the check for safety reasons.  Delays to ensure officer safety are not

considered diversions from a stop's traffic-based purpose.  *See Garner*, 961 F.3d at 271

("delays caused by safety concerns related to the stop" fall within the scope of a traffic stop).

Even if he was not concerned about safety, Trooper Powell compares the criminal history

check to a driver's license check, another well-settled traffic-related inquiry.

However, the Third Circuit has not directly addressed whether a criminal history

check is akin to a driver's license check, nor whether it is a valid safety precaution.  *See*

*United States v. Latorre-Cacho*, No. 1:21-CR-160, 2022 WL 16541170, at *6 n.3 (M.D. Pa.

Oct. 28, 2022) (discussing the dearth of post-*Rodriguez*, precedential case law on this

topic); *see also United States v. Hunter*, No. CR 19-635, 2021 WL 5356770, at *4 (E.D. Pa.

Nov. 17, 2021) ("The Third Circuit has also not said whether criminal history searches are

permissible safety precautions.").  The issue has been discussed in nonprecedential

opinions, and related but distinguishable issues have been discussed in precedential

16

opinions.  In *United States v. Frierson*, the Third Circuit stated that "any preliminary delay in checking [the defendant's] license, registration, and criminal history was justified as part of the stop."  611 F. App'x 82, 85 (3d Cir. 2015).  In *Garner*, the court held that verbal questioning about the defendant's criminal history was "not tied to the traffic stop's mission . . . because it was 'aimed at detecting criminal activity more generally.'"  961 F.3d at 271 (quoting *Green*, 897 F.3d at 179).  And in *Clark*, verbal questioning about the defendant's criminal history that occurred after a criminal history check had been conducted was "not tied to the traffic stop's mission."  902 F.3d at 411.  The *Clark* court did not directly review the district court's determination that the initial computerized criminal history check was a permissible "ordinary inquiry."  *Id.* at 408 (citing *United States v. Clark*, No. 16-449, 2017 WL 3394326, at *7 (D.N.J. Aug. 7, 2017)).

Several district courts in this Circuit have recently faced this question.  The *Latorre-Cacho* court, recognizing the issue as unsettled in this Circuit, resolved the question of reasonable suspicion without considering the impact of a criminal history check.  *See* 2022 WL 16541170, at *6 n.3.  The court in *Hunter* determined that, based on the officer's testimony, the criminal history search was performed "to gather reasonable suspicion to further an investigation," and held that without independent reasonable suspicion to do so, it was unconstitutional.  *See* 2021 WL 5356770, at *1.  On the other hand, the court in *United States v. Stanger* held that the officer's "decision to check [the defendant's] driver's license and criminal history was justified as part of the traffic stop."  No. 4:21-CR-00264, 2023 WL

17

1071648, at *4 (M.D. Pa. Jan. 27, 2023) (slip op.) (first citing *Clark*, 902 F.3d at 410; and then citing *Frierson*, 611 F. App'x at 85).

With this in mind, the Court concludes the criminal history check here is properly considered an ordinary, traffic-related inquiry.  While not precedential, *Frierson* seems to endorse this approach.  *Clark* and *Garner* are distinguishable because Trooper Powell's inquiry into criminal history did not involve verbal questioning until much later; instead, his search of NCIC was more analogous to a routine check of a driver's license, as the district court in *Clark* held.  Moreover, this case is distinguishable from *Hunter*, where the officer admitted that the records were searched for purposes of "gathering reasonable suspicion to further an investigation."  *Hunter*, 2021 WL 5356770, at *1.  Finally, other circuits have directly addressed this question in precedential opinions and decided the same.  *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017) ("an officer reasonably may search a computer database during a traffic stop to determine an individual's prior contact with local law enforcement, just as an officer may engage in the indisputably proper action of searching computer databases for an individual's outstanding warrants"); *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015) ("an officer may prolong a traffic stop to investigate the driver's license and the vehicle registration, including by requesting a computer check, or while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation").  For all of these reasons, the criminal history check was not a deviation from the purpose of the stop.

The Court therefore agrees with both parties that the *Rodriguez* moment occurred when Defendant was brought back to the patrol car, *after* the criminal history check.

### 2. Reasonable Suspicion

The extension of the stop beyond the *Rodriguez* moment was unlawful only if not supported by reasonable suspicion.  Here, when considered in totality, each of the articulated factors contributed to the formation of reasonable suspicion before the *Rodriguez* moment.  The extension was therefore lawful.  Trooper Powell identified six factors: (1) a single key; (2) travel on a "main drug corridor"; (3) the "overwhelming smell of air fresheners or a masking agent"; (4) the double window tint; (5) Defendant's criminal history, including convictions related to drug trafficking; and (6) Defendant's explanation of the reason for his travel.  (Hearing Tr. at 21:1–22:11.)

All of these factors have been held to contribute to reasonable suspicion in combination with other indicators of criminal activity.  First, the use of a single key may arouse suspicion because it suggests the vehicle is a third-party or "work vehicle" used for drug trafficking.  (Hearing Tr. at 21:19–24); *see United States v. Ramirez-Mendoza*, No. 4:20-CR-00107, 2021 WL 4502266, at *8 (M.D. Pa. Oct. 1, 2021) ("A single key is often passed around or left in a location for a mule or trafficker to take that vehicle and take it from point A to point B."); *Meran*, 2017 WL 4803927, at *3.  Here, while Defendant's registration should have dispelled any suspicion that the Durango was a third-party vehicle,

it did not dispel suspicion that it was a work vehicle.  The single key therefore reasonably raised Trooper Powell's suspicion.

Second, traveling on a known drug corridor, and specifically I-80, is frequently cited by law enforcement officers as contributing to suspicion.  *See, e.g., United States v. Meran*, 2017 WL 4803927 *3 (W.D. Pa. 2017) ("Interstate 80 is a known major drug corridor."); *United States v. Langley*, No. 3:15-CR-155, 2017 WL 4444208, at *6 (M.D. Pa. Oct. 5, 2017) (describing I-80 as a "a well-known drug corridor for illegal narcotic transportation"); *see also Garner*, 961 F.3d at 272 (defendant's travel on I-81, a "drug trafficking corridor," contributed to reasonable suspicion).

Third, the presence or scent of air fresheners has also been held to contribute to reasonable suspicion, because they are "often used to mask the odor of narcotics."  *Meran*, 2017 WL 4803927, at *3; *United States v. Prado*, No. 3:15-CR-151, 2017 WL 1653957, at *7 (M.D. Pa. May 1, 2017), *aff'd,* 788 F. App'x 897 (3d Cir. 2019).

Fourth, Defendant's tinted windows were a valid indicator of criminal activity.  To begin with, excessive window tint is independently unlawful under the Pennsylvania Vehicle Code.  75 Pa. C.S.A. § 4524(e)(1).  Trooper Powell also testified to a belief, based on his training and experience, that tinted windows are often associated with drug trafficking and the presence of hidden compartments.  Other courts have credited such testimony as contributing to reasonable suspicion.  *See, e.g., Stanger*, 2023 WL 1071648, at *5 (officer's

belief that "excessive window tint is a common indicator of vehicles used to transport contraband" contributed to reasonable suspicion); *Meran*, 2017 WL 4803927, at *3 (same).

Fifth, Trooper Powell testified that he found Defendant's travel plans suspicious. Based on his knowledge of transfer cases, Trooper Powell believed it strange that someone would drive a vehicle without a working transfer case "15 plus hours, a thousand plus miles across multiple metropolitan areas to get a piece for that vehicle." (Hearing Tr. at 16:9–13.) So, his suspicion was twofold: It did not make sense to travel that distance in a vehicle without a working part, nor did it make sense to travel that distance to buy a part rather than buying it somewhere closer or, easier yet, ordering it online. (*See id.* at 26:2–5.)

Neither Defendant's explanation regarding the price of the part nor the presence of the part inside the vehicle dispelled Trooper Powell's suspicions. Trooper Powell viewed the part as a "prop, which [Defendant] uses to explain why he's traveling so far." (Hearing Tr. at 24:17–19.) He testified further:

> **Q.** Is that based upon training you've had?
>
> **A.** Yes, so this is based upon training. Through training, I know that traffickers use props to give credibility to the story that they're giving law enforcement and the reason for their travel, because they have to come up with something, some reason why they're traveling so far, and it's, also, through experience, because, in previous stops, before I stopped the Defendant, I had seen similar props used to deter suspicions of law enforcement.

(*Id.* at 24:21–25:3.) This determination, based on Trooper Powell's training and experience in the field, is afforded deference. *Foster*, 891 F.3d at 104. An officer's disbelief or confusion regarding travel plans frequently contributes to findings of reasonable suspicion.

21

See *Green*, 897 F.3d at 185 ("statements concerning [defendant's] travel were sufficiently confusing so as to meaningfully contribute to reasonable suspicion") (citing *Benoit*, 730 F.3d at 285–86); *United States v. Robinson*, 529 F. App'x 134, 138 (3d Cir. 2013) ("unusual explanation of [defendant's] travel plans" contributed to reasonable suspicion).[7]

Defendant urges his travel plans were not indicative of criminal activity and offers various reasons why his story was plausible.  (*See* Doc. 33 at 12 (discussing the price of the transfer case, the price of gas, and the "absurd[ity]" of the suggestion that he could have ordered the part online).)  This argument is unpersuasive.  The Court need not decide whether Defendant's stated travel plans were objectively rational or economically sound.  It need only determine whether Trooper Powell's "commonsense judgment" regarding the explanation was reasonable, in light of his training and experience.  *Glover*, 140 S.Ct. at 1188.  On these facts, the Court defers to Trooper Powell's determination that the travel plans were suspicious.

Finally, Trooper Powell cited Defendant's criminal history.  It is well-settled that a criminal record is a valid factor contributing to reasonable suspicion.  *Green*, 897 F.3d at 187 (citing *United States v. Mathurin*, 561 F.3d 170, 177 (3d Cir. 2009)).  As the *Green* court

---

[7] Trooper Powell also mistakenly believed there was no luggage in the vehicle, which he found suspicious presumably because of the distance Defendant had traveled.  In fact, there was luggage in the vehicle, but Trooper Powell testified that he did not see it because of the window tint.  Defendant seizes on this mistake.  (*See* Doc. 33 at 12.)  But reasonable suspicion may be based on a mistake of fact, as long as that mistake is a reasonable one, which this mistake was.  *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014).  Consequently, Trooper Powell's mistaken belief adds to his overall suspicion.

noted, such information is "not only permissible, but is often helpful," and its "utility is

enhanced when the prior offenses relate to the crime being investigated." *Id.* (quoting

*United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993)).  Here, Trooper Powell learned

that Defendant had previously been convicted of drug offenses, the exact crime of which the

Trooper was now suspicious.  This information accordingly contributed to his overall

suspicion.

Although independently lawful, considered in totality, these factors amounted to

reasonable suspicion that criminal activity was afoot.  Defendant argues "[t]here is not a

single factor or combination of factors on this list that would justify extending a traffic stop

and detaining someone for a criminal investigation."  (Doc. 33 at 11.)  The bulk of

Defendant's argument is no more than a "divide-and-conquer analysis," which the case law

expressly rejects.  *Arvizu*, 534 U.S. at 274.

Defendant's reliance on *United States v. Barrera* is also misplaced.  (*See* Doc. 54 at

9–10 (citing No. 3:22-CR-25, 2023 WL 3480893, at *1 (M.D. Pa. May 16, 2023)).)  While

*Barrera* bears some resemblance to the case at hand, "[t]he inquiry into the existence of

reasonable suspicion is fact-specific."  *Mitchell v. Twp. of Willingboro Municipality Gov't*, 913

F. Supp. 2d 62, 72 (D.N.J. 2012) (quoting *Karnes v. Skrutski,* 62 F.3d 485, 493 n.5 (3d Cir.

1995)).  As the Supreme Court has opined, "because the mosaic which is analyzed for a

reasonable-suspicion or probable-cause inquiry is multi-faceted, 'one determination will

seldom be a useful "precedent" for another.'"  *Ornelas v. United States*, 517 U.S. 690, 698

(1996).  This case illustrates the point.  The Government asserted many of the same factors

in support of reasonable suspicion here as in *Barerra*.  But the Court cannot, for example,

measure precisely the degree to which Barerra's explanation for travel was more or less

implausible as compared to Defendant's explanation, nor the credibility of one officer's

testimony compared to the other.  In short, to the extent they are factually similar, those

similarities do not warrant the same outcome under the law.

Trooper Powell was therefore justified in expanding the scope of the stop and

extending it to investigate criminal activity unrelated to the traffic violation.

### 3. Length of Detention

Notwithstanding that Trooper Powell was justified in expanding the scope of the

investigation, the length of Defendant's detention must also have been reasonable, given

the limits of *Terry*.  *See United States v. Leal*, 235 F. App'x 937, 940 (3d Cir. 2007).

Defendant argues his detention was unlawful because he was held for eighty-two minutes

while Trooper Powell waited for a canine to arrive.  (*See* Doc. 54 at 12.)

To be sure, the delay here was close to the outer limits of "reasonableness" as

required under *Terry*.  *See Terry,* 392 U.S. at 33.  The intrusion authorized by *Terry* "is

limited to a *brief* detention to determine if criminal activity is afoot."  *Leal*, 235 F. App'x at

940–41 (citing *Terry,* 392 U.S. at 33).  While there is "no rigid time limitation on *Terry* stops,"

*Sharpe,* 470 U.S. at 685, "[a] stop may be too long if it involves 'delay unnecessary to the

legitimate investigation of the law enforcement officers.'"  *Leal*, 235 F. App'x at 941.  Courts

must consider "the duration of the stop, the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and alternative means by which the police could have served their purposes." *Id.* (citing *Sharpe*, 470 U.S. at 685).

At the hearing, Defense counsel's questioning of Trooper Powell seemed to suggest that Trooper Powell's attempts to secure a canine officer were not sufficiently diligent and resulted in unnecessary delay. (*See* Hearing Tr. at 59–60 (questioning why Trooper Powell called canine officers directly instead of calling dispatch).) Trooper Powell's testimony demonstrated, however, that he acted diligently by contacting both a canine officer and supervisor, in quick succession and immediately after issuing the warning. (*See id.*; *see also* Hearing Tr. at 61:7–62:14.) The delayed arrival of the canine was caused by circumstances outside of Trooper Powell's control: He struggled to locate an available officer, and even Corporal Doblovasky, who ultimately contacted Trooper Powell and confirmed he would come, was off duty and presumably not nearby. (Hearing Tr. at 33L2–4.)

While close to the limit, the eighty-two minute delay from when Trooper Powell tried to request a canine unit until a canine unit arrived was not unreasonable. *Leal* is instructive. In *Leal*, a canine unit arrived at the scene approximately forty-five minutes to an hour after it

25

was requested, resulting in a detention of at least eighty minutes.[8]  235 F. App'x at 940;

*United States v. Leal*, 385 F. Supp. 2d 540, 545 (W.D. Pa. 2005).  The delay was attributed

in part to road construction on route.  Concluding that "Leal's detention may have bumped

up against the outer limit of a Terry stop, but it did not cross it," the Third Circuit panel

affirmed the district court's denial of the defendant's motion to suppress.  235 F. App'x at

942.  In doing so, the panel reasoned that the officer's efforts to "expeditiously resolve his

suspicions were frustrated by circumstances beyond his control," and the "quantity and

quality of the factors that gave rise to [the officer's] suspicion" in conjunction with his diligent

efforts to investigate demonstrated the reasonableness of the *Terry* stop.  *Id.*; *see also*

*United States v. Frost*, 999 F.2d 737, 741 (3d Cir. 1993) (sixty-five minute delay pending

arrival of canine did not render unlawful the investigative detention of defendant's suitcase).

Moreover, several cases outside of the Third Circuit lend support for a delay of this

duration or longer.  *See, e.g., United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005)

(almost three-hour detention was reasonable when delay was caused by circumstances

outside officers' control, including remote location); *United States v. White*, 42 F.3d 457, 460

(8th Cir. 1994) (eighty-minute detention of truck pending canine arrival due to "remote

location of the closest available dog" was reasonable).

---

[8]The detention in *Leal* was supported by reasonable suspicion.  The question was "whether the length of the delay between the time [the officer] radioed for the dog and the time [the dog] arrived was so great that it either constituted a *de facto* arrest, or was inconsistent with the limited intrusion allowed under *Terry*."  *Leal*, 235 F. App'x at 940.

In total, 104 minutes passed between the initial stop of the Durango and Corporal Doblovasky's arrival.  (MVR at 1:48.)  The eighty-two minute delay pending the arrival of the canine here was, significantly, at least twenty minutes longer than that in *Leal*, and at least fifteen minutes longer than that in *Frost*.  But while the delay was longer, the circumstances were the same, and Defendant points to no persuasive evidence of a lack of diligence on the part of Trooper Powell.  The Court concludes the fifteen and twenty-minute differences are not dispositive.  *See Frost*, 999 F.2d at 742 ("declin[ing] to abstract the duration of [a] seizure . . . from its circumstances" and considering the duration of the seizure in light of the officers' diligence) (citing *United States v. Place,* 462 U.S. 696 (1983)).

Thus, the delay was reasonable, and Defendant's argument fails with respect to the extension of the stop.

## IV. CONCLUSION

For the foregoing reasons, Defendant's "Motion to Dismiss Indictment and Suppress Evidence" (Doc. 32) will be denied.[9]  A separate Order follows.

Robert D. Mariani
United States District Judge

---

[9] Defendant's Motion only addresses dismissal of the Indictment insofar as it implies that the evidence upon which the Indictment is based was obtained in violation of the Fourth Amendment.  (*See generally* Doc. 32.)  Because no Fourth Amendment violation occurred, his Motion will accordingly be denied in both respects.